FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

8/30/22

SEAN F. McAVOY, CLERK

*AUSA Assigned: RRB*

*County of Investigation: Okanogan*

*In Re: Affidavit for Criminal Complaint charging ALBERT TRAMPIS DOGSKIN, JR with Aggravated Sexual Abuse and Tampering with a Witness, Victim, or Informant.*

## AFFIDAVIT

STATE OF WASHINGTON )
                     ) ss
County of Spokane    )

## INTRODUCTION AND AGENT BACKGROUND

**1.** I, Brian Hoff, Special Agent, being first duly sworn on oath, depose and state the following:

**2.** I am Special Agent (SA) for the Federal Bureau of Investigation (FBI). This affidavit is in support of an arrest warrant for Albert Trampis DOGSKIN, JR.

**3.** I have been a Special Agent with the FBI since April 2010, and I am currently assigned to the Spokane Resident Agency within the Seattle Field Office of the FBI, which conducts investigations into violent crime in Indian country in conjunction with the FBI's Salish Safe Trails Task Force, a multi-agency Federal and Tribal task force. Prior to this assignment, I investigated federal terrorism charges while assigned to the joint terrorism task force in the Boston Division. When I relocated to Spokane, I was initially assigned to the Safe Streets Task Force, where I was responsible for investigating, among other things, violations of the Controlled Substances Act. I later requested and accepted an assignment to work on the Safe Trails Task Force. In this role, I am responsible for investigating violent crime on the Colville, Spokane, and Kalispel Indian Reservations.

4. My work in Indian country began even prior to relocating to Spokane. I attended the joint FBI/Bureau of Indian Affairs (BIA) basic training course in Artesia, New Mexico for agents assigned to investigate crimes on Indian Reservations. Immediately prior to my reassignment to the Spokane Resident Agency, I worked in the FBI's Minneapolis Division. There, and over the course of approximately three years, I handled violent crime investigations on several Indian reservations located within North Dakota.

5. My experience as an FBI agent includes, but is not limited to, conducting physical surveillance, interviewing witnesses and subjects, executing search and arrest warrants, and operating informants. I am an investigative or law enforcement officer of the United States, within the meaning of 18 U.S.C. § 2510(7), as a Special Agent of the FBI, and I am empowered by law to conduct investigations of, and to make arrests for, federal felony offenses.

## INVESTIGATION AND PROBABLE CAUSE

6. As set forth herein, I submit there is probable cause to believe that Albert Trampis DOGSKIN, Jr. (hereafter "DOGSKIN"), an enrolled member of the Standing Rock Sioux Tribe, violated 18 U.S.C. §§ 2241(a), 1153 (Sexual Abuse in Indian Country) and 18 U.S.C. § 1512(C) (Tampering with a Witness or Victim). As described in further detail below, three women have independently come forward alleging that they were raped, and each identified DOGSKIN as their rapist. Each victim's account is detailed below, and their allegations are corroborated by physical, forensic, and eyewitness evidence. The allegations are further corroborated by recent actions indicating that DOGSKIN learned that at least one of his victims identified DOGSKIN to law enforcement. After learning that the victim had contacted police, DOGSKIN made contact with this victim and threatened to make the victim disappear. The victims are identified herein as Victim 1, Victim 2, and

Victim 3. The allegations and subsequent investigation, which are described in greater detail below, are summarized as follows:

- DOGSKIN is alleged to have physically assaulted an individual identified herein as Victim 1 and forced Victim 1 to engage in sexual relations against her will in April 2017 and October 15, 2020. The 2017 assault allegedly occurred in an abandoned house near Nespelem, Washington. The 2020 assault occurred on Gold Lake Road, near Nespelem, WA. Both incidents occurred on the Colville Indian Reservation.

- DOGSKIN is alleged to have physically assaulted a second individual identified herein as Victim 2 and forced her to engage in sexual intercourse against her will on or about November 30, 2017 on the Colville Indian Reservation. DOGSKIN is further alleged to have held Victim 2 her against her will.

- DOGSKIN is alleged to have physically assaulted an individual identified herein as Victim 3 and forced her to engage in sexual intercourse against her will on or about June 20, 2020. Victim 3 was raped at knifepoint near a remote roadway on the Colville Reservation. After the sexual assault, Victim 3 walked nearly twenty miles barefoot to escape DOGSKIN.

- On August 16, 2022, DOGSKIN made contact with Victim 2's partner, and threatened to make Victim 2 disappear. The threat against Victim 2 occurred after DOGSKIN learned that Victim 2 had contacted law enforcement officials. Victim 2 was present and heard DOGSKIN's voice and threat.

7. Each of the victims reported these assaults to law enforcement close in time to the incidents described herein. Certain of the victims also submitted DNA samples and/or agreed to be examined by a sexual assault nurse. The victims, however, at various points have resorted to using illegal narcotics and declined to meet with federal law enforcement until recently when the investigating agents were able to interview two of the victims while they were in custody, and one victim in

the community. During these interviews, further details of the incidents were ascertained confirming the victims' initial accounts.

8. Notably, this affidavit does not contain all of the information known to me or to law enforcement regarding this investigation, but rather contains only those facts believed to be necessary to support the criminal complaint. I have personally participated in this investigation, and the following information is derived from my personal observations, review of official documents, and information provided by other sworn law enforcement officers and community corrections personnel.

### Aggravated Sexual Abuse in April 2017 – Victim 1

9. On or about May 9, 2017, Colville Tribal Policer Officer William Bob interviewed an individual hereafter identified as Victim 1. At the time, Victim 1 was in custody at the Colville Tribal Correctional Facility on Tribal charges. Victim 1 stated DOGSKIN raped her a few weeks earlier. Specifically, Victim 1 explained she was walking home when DOGSKIN pulled up next to her and told her to get his vehicle. Victim 1, who had been in an on-again, off-again relationship with DOGSKIN, explained she was afraid DOGSKIN might hurt her if she refused, so she got into the car. DOGSKIN took Victim 1 to an abandoned house on Gold Lake Road in Nespelem, WA, which is within the boundaries of the Colville Indian Reservation. DOGSKIN then proceeded to sexually assault Victim 1 for the next two or three hours. Although Victim 1 told DOGSKIN that she did not want to have sex and told him to stop, DOGSKIN proceeded to penetrate Victim 1 vaginally with his penis. Victim 1 further stated that DOGSKIN did not wear a condom and did ejaculate.

10. Upon learning of these allegations, Colville Tribal Police obtained a search warrant for the house on Gold Lake Road. During the search, Tribal Police recovered, among other things, a fitted sheet, green blanket, and a mattress top. The

officers also obtained buccal swabs for DNA from Victim 1 and DOGSKIN. The items were submitted to the Washington State Crime Lab for analysis. DNA testing confirmed that DOGSKIN's semen was on the fitted sheet, green blanket, and mattress top. Victim 1's DNA was not identified on the items collected.

11. After Victim 1 was released from custody at the Colville Tribal Correctional Facility, she may have returned to the on-again and off-again relationship with DOGSKIN. As a result of Victim 1's ongoing drug abuse, Victim 1 resisted further law enforcement contacts for a period of time.

### Aggravated Sexual Abuse in October 2020 – Victim 1

12. On August 25, 2022, FBI Special Agent Lindsay McIntosh and I contacted Victim 1, who agreed to speak with the FBI. Victim 1 confirmed the sexual assault in April 2017. She also explained she was no longer in a relationship with DOGSKIN. In the interview, Victim 1 stated DOGSKIN physically and sexually abused her on other occasions.

13. Specifically, Victim 1 described an incident that took place on or around October 13th or 15th of 2020 on the Colville Indian Reservation. DOGSKIN forced Victim 1 to remove her clothing while inside DOGSKIN's truck. Victim 1 was uncomfortable with this and wanted to get out of the truck and run to a friend's house, but she did not have shoes on. Victim 1 also questioned how far she could make it, knowing she would be unable to outrun DOGSKIN. Victim 1 thought she might make things worse if she attempted to run.

14. DOGSKIN pulled the truck over in a remote area in a field off of Gold Lake Road. DOGSKIN wanted to have sex with Victim 1, but she did not. DOGSKIN then raped her vaginally with his penis until her vagina was so sore and swollen, he could no longer penetrate Victim 1 vaginally. DOGSKIN then spit into his hand and applied the spit to Victim 1's vagina. Special Agent McIntosh

understood Victim 1 to say that because DOGSKIN still couldn't penetrate Victim 1 vaginally, he then proceeded to rape Victim 1 anally, as she begged him to stop.

15. Once DOGSKIN finished sexually assaulting Victim 1, DOGSKIN began driving again. Victim 1 was still naked in the front passenger seat of the truck. In fact, DOGSKIN refused to let Victim 1 get dressed and even threw some of her clothing out of the window. Victim 1 told DOGSKIN she just wanted to go home.

16. Around this point, Victim 1 saw a Colville Tribal Police patrol car pass DOGSKIN's truck and turn around. At this point, DOGSKIN directed Victim 1 to get out of the vehicle. Victim 1 was naked, scared, and uncomfortable; nevertheless, she got out of the truck – naked and barefoot. She grabbed a pillow from the back of his truck to try and cover herself, and DOGSKIN left her on Gold Lake Road. DOGSKIN's truck then pulled away, and the Tribal Police patrol car followed. Victim 1 explained that no officers attempted to make contact with her after she got out of DOGSKIN's truck. Instead, the officers pursued DOGSKIN.

17. A Colville Tribal Police Department report confirmed an October 15, 2020 incident involving DOGSKIN. In the report, officers noted they pursued DOGSKIN, while also passing Victim 1, who was naked on the roadway. Photographs of the interior of DOGSKIN's truck depicted what appeared to be women's clothing on the front passenger seat and shoes on the passenger floorboard. The police report did not indicate that officers were able to follow-up with Victim 1.

18. Notably, while Special Agent McIntosh spoke with Victim 1, I interviewed one of the one of Victim 1's family members. The family member stated that the family member knew DOGSKIN and indicated that he has seen DOGSKIN regularly carry firearms on his person.

**Aggravated Sexual Abuse on November 30, 2017 – Victim 2**

19. On June 29, 2022, Special Agent McIntosh and your affiant interviewed Victim 2 at the Okanagan County Jail. Victim 2 was in custody at the time on a state matter. Special Agent McIntosh and I met with Victim 2 to ask her about sexual assault allegations Victim 2 raised against DOGSKIN in November 2017. This was the first time federal law enforcement agents were able to speak with this victim. Victim 2's account appeared to be largely consistent with statements she previously made to Tribal law enforcement in 2017, shortly after the assault.

20. In the June 2022 FBI interview, Victim 2 explained she had traveled to DOGSKIN's home in Nespelem, Washington to pick up her car in November 2017. At the time, DOGSKIN was living with his mother, Blanche Dogskin at 421 Ninth Street in Nespelem, WA, which is within the boundaries of the Colville Indian Reservation. Although a friend warned Victim 2 not to go to DOGSKIN's house, Victim 2 did so anyway, believing she would be there for just a few minutes to get the car.

21. Ultimately, Victim 2 was at DOGSKIN's home for approximately four days. Victim 2 explained that DOGSKIN took her into a recreational vehicle (RV), which was parked near Blanche Dogskin's home, and he locked the door. There were three deadbolts inside the RV. Victim 2 described the RV as about 32 feet in length with white waves on the side. There also was a padlock on the outside of the RV. Whenever DOGSKIN would go outside the RV, he would lock Victim 2 inside with the padlock.

22. Inside the RV, DOGSKIN physically and sexually assaulted Victim 2 several times. Victim 2 described DOGSKIN pushing her onto the bed and removing her clothes. He then raped her vaginally and anally with his penis and fingers. Victim 2 expressed, "I tried to push him away. I told him no. I was bawling my eyes

out shaking." Victim 2 further explained that DOGSKIN did not use a condom, but did ejaculate.

23. Victim 2 estimated that DOGSKIN raped her numerous times over the four days – possibly as many as "50 times or more." Victim 2 told DOGSKIN that she "was sore and that I couldn't do it . . . that he had to stop," but "he didn't care he would just laugh at me." During the assault, DOGSKIN told Victim 2 she would be okay and that all girls are the same – if he provided them with drugs, they would be willing to do anything. At one point, Victim 2 asked DOGSKIN, "Why would you want to fuck someone who is crying and doesn't want to be around you?" DOGSKIN responded by laughing as Victim 2 continued crying. Victim 2 added that she believed DOGSKIN may have taken pictures and videos of the sexual assault with a flip phone that DOGSKIN had in his possession. DOGSKIN also took away Victim 2's phone, so she was unable to contact anyone for help.

24. Victim 2 explained that during the incident, DOGSKIN threatened to burn her with a heater that was inside the RV. DOGSKIN also punched her three times in her nose and cheek bone with what she believed was his right fist. When she was standing refusing to lay down, DOGSKIN kicked her in the leg. During the ordeal, DOGSKIN explained what he would do if Victim 2 escaped and told anyone about what had happened. Victim 2 reported that DOGSKIN threatened to "tie me to a chair with cinder blocks and shave my head and drop me somewhere in the lake in Nespelem." DOGSKIN also stated, "no one would find me" and that no one would even come looking for Victim 2 on the reservation.

25. On November 30, 2017, the fourth day in DOGSKIN's RV, Victim 2 began moving toward the door to try and escape. She knew she had to get through three deadbolts in a tight space, so she would have to move quickly. Finally, Victim 2 was able to unlock each of the deadbolts. At this point, DOGSKIN jumped up, and

Victim 2 ran from the RV. As Victim 2 put it, she just kept running. She ran across the highway toward DOGSKIN's ex-girlfriend's house (Victim 1's home). Although Victim 1 was not there, Tribal Police officers were in the area. When Tribal Police saw Victim 2, she had blood on her clothes and had a number of bruises.

26.  After escaping from DOGSKIN, Victim 2 spoke with Colville Tribal Police and explained that DOGSKIN physically and sexually assaulted her. At the time she spoke to Tribal Police, however, Victim 2 believed she had at least one active arrest warrant, and she gave her twin sister's name rather than her own because Victim 2 did not want to go to jail. She also was concerned that DOGSKIN may be listening in on a police scanner in his home, and Victim 2 did not want DOGSKIN to hear her name over the police radio.

27.  Victim 2 provided a written statement to the tribal police, again in her twin sister's name, and then accepted a ride from Tribal Police to Coulee Dam – i.e., to get away from DOGSKIN. The Tribal Police encouraged Victim 2 to go to the hospital for a rape kit, but Victim 2 declined. In her subsequent interview with the FBI, Victim 2 explained she decided against the rape kit because she was worried the medical personnel would realize she wasn't the twin sister and would be arrested. In hindsight, Victim 2 stated that she should have gone to the hospital, but at the time, she was "all messed up on drugs and stuff . . ." and, "didn't want to go to jail."

28.  Approximately 5 days after Victim 2 escaped from DOGSKIN, she was arrested on the outstanding warrant and booked into the Grant County Jail. Booking photographs from the Grand Coulee Police Department and Grant County Jail depicted injuries to Victim 2's face consistent with what was subsequently reported to the FBI. Additionally, pictures that Tribal Police took on November 30, 2017 – when Victim 2 escaped DOGSKIN and spoke with Tribal Police – depicted Victim 2 with injuries to her face and blood on her clothing.

### June 20, 2020 Aggravated Sexual Abuse – Victim 3

29. On March 3, 2022, FBI Task Force Officer David LaBounty, Colville Tribal Victim Specialist Gloria Martinez, and I interviewed a third victim – Victim 3. Victim 3 previously had reported to Tribal Law Enforcement that DOGSKIN assaulted her on or about June 20, 2020. In the March 2022 interview, which was the first time the FBI was able to speak with Victim 3, she provided information consistent with her statement from 2020 when the assault was more recent. The March 2022 interview occurred while Victim 3 was in custody at the Colville Tribal Corrections Facility in Nespelem, Washington. At the time of the interview, Victim 3 was in custody on tribal charges.

30. In her interview with the FBI, Victim 3 described her interactions with DOGSKIN on the evening of June 19 into the morning hours of June 20, 2020. Specifically, Victim 3 explained she had been drinking that evening in Nespelem and went to DOGSKIN's mother's house, where she had more to drink. Because Victim 3 had been drinking, she planned to walk home, but DOGSKIN offered her a ride. DOGSKIN and Victim 3 got into his mother's car, which Victim 3 described as silver or gray Buick LaSabre. The two drove out of Nespelem on Gold Lake Road.

31. Instead of driving to Victim 3's home, DOGSKIN began driving out of town. Victim 3 became uncomfortable and asked DOGSKIN to stop the car. When DOGSKIN refused and instead sped up, Victim 3 considered jumping out. DOGSKIN told Victim 3 to "relax" and explained they were "just going for a cruise." Victim 3 responded to DOGSKIN that there was a house a little way back, and said she would just walk. DOGSKIN, however, did not stop.

32. At some point during the drive, DOGSKIN said he was going to smoke, what Victim 3 later described as methamphetamine and heroin, and asked Victim 3 if she wanted to join him. Victim 3 declined and asked if she could drive, given that

DOGSKIN was going to smoke. DOGSKIN refused to let Victim 3 take the wheel. Victim 3 estimated that they drove along Gold Lake Road for about an hour after they left the DOGSKIN residence. DOGSKIN drove past the turnoff for Gold Lake and continued for some distance. Eventually, DOGSKIN drove into a pullout spot along the road. Notably, both Gold Lake and the entirety of Gold Lake Road are located within the external boundaries of the Colville Indian Reservation.

33. At some point, Victim 3 was able to get out the car and began walking. DOGSKIN, however, chased down Victim 3 and grabbed her by her shirt. She described feeling pressure to her back like DOGSKIN was pushing an object against her body. Victim 3 asked why DOGSKIN was "poking her with a pen." To this, DOGSKIN responded that it was a knife and told Victim 3 that she wasn't going anywhere. DOGSKIN then demanded that Victim 3 get back in the car. Victim 3 started to get into the front seat, but DOGSKIN demanded that she get in the rear passenger compartment.

34. After DOGSKIN demanded that Victim 3 reenter the car, DOGSKIN directed her to remove her clothing and stated that it would be over quick. Victim 3 begged to go home and told DOGSKIN she did not want to have sex. DOGSKIN, however, reiterated it would be over quick. DOGSKIN then pulled Victim 3's tank top, ripping it and popping the buttons off of her sweats. He also threatened to stab Victim 3 if she didn't have sex with DOGSKIN.

35. After DOGSKIN had ripped her tank top, Victim 3 removed some of her other clothing – including her underwear – so DOGSKIN didn't rip the other clothes. DOGSKIN told Victim 3 to scoot over, and one of her sandals fell off. She later kicked the other one off. Victim 3 explained that DOGSKIN had a pocketknife in his right hand. She described it as a silver folding knife with a wooden handle. Victim 3 recalled that the knife was several inches long and explained that

DOGSKIN eventually laid the knife down on the floor – possibly to put a condom on.

36.     Victim 3 explained that what happened next "was not quick" and "it was not painless." Victim 3 stated that DOGSKIN vaginally raped her, penetrating her with his penis. DOGSKIN forced himself upon Victim 3, even though she told him, "No." As DOGSKIN was penetrating Victim 3, he stated, "I can't feel nothing, I fucking hate these things" and removed the condom. During the FBI interview, Victim 3 stated she wasn't certain whether DOGSKIN ejaculated or "finished," but she thought he did. Throughout the assault, Victim 3 repeatedly told DOGSKIN "she didn't like it." She repeatedly told him to stop and cried throughout the incident.

37.     Afterwards DOGSKIN wanted to hold or cuddle with Victim 3, but she did not want to be touched. She pulled her pants on and tried to hold her tank top shut. Around that time, DOGSKIN fell asleep. He had been leaning on Victim 3 with his arm around her and started snoring in her ear. Victim 3 removed DOGSKIN's head from her shoulder without waking him. He continued to snore.

38.     After she got out from under DOGSKIN's arm, Victim 3 tried to find the Adidas hoodie in the front seat of the car. Although it was dark, she then noticed DOGSKIN stirring.  At this point, Victim 3 took off, leaving behind her phone, cigarettes, lighter, her pocketknife, and what remained of a bottle of liquor. She also could not find her sandals, which had come off during the sexual assault. From there, Victim 3 started walking. As she walked, she was terrified DOGSKIN would wake up and stab her.  Victim 3 put it something like this:  It was dark, she was out in the middle of nowhere, and she could not see anything but trees and the dirt.

39.      As Victim 3 walked, she passed a few houses along the way. She knocked, but nobody would answer. Victim 3 recalled that at about 10:00 or 11:00

the next morning, she finally made it to Fred Clark's house, which was the first house in the Old HUD neighborhood in Nespelem.

40. Clark, who is now deceased, was in a dating relationship with Victim 3's aunt at the time. When Victim 3 showed up at Cark's house, he asked what was wrong and wanted to know why Victim 3's tank top was ripped. Clark also asked why Victim 3 was barefoot. Victim 3 asked if she could stay and wait for her aunt, who wasn't home at the time. Victim 3 then asked if she could go to sleep in Clark's spare room, and Clark told her to go ahead. Victim 3 explained that she didn't want to feel anything and started drinking while she waited for her aunt to come home.

41. Eventually, Victim 3's aunt returned. The aunt provided Victim 3 with another tank top and a pair of sandals. Victim 3 recalled that her feet hurt and were later black and bruised. Victim 3 recalled that she had scratches on her arms, which she believed were from hiding in a ditch to avoid detection by as a passing car (fearing the passing car was DOGSKIN), as she walked from DOGSKIN's car back to Nespelem.

42. Victim 3 explained that she was never in a relationship with DOGSKIN. While she had known of DOGSKIN since she was 11 or 12 years old, she never really gotten to know him. They weren't friends and she had never been romantic with DOGSKIN. Victim 3 also recalled that she hadn't had sex with anyone for several weeks prior to the assault.

43. Victim 3 recalled speaking with Tribal Police, who arrived at Clark's home later that day. Victim 3 described the assault to the officers, who took her to Coulee Medical Center. Victim 3 recalled going to the hospital, where medical personnel administered a Sexual Assault Nurse Exam (SANE).

44. Victim 3's account of a sexual assault and walking several miles from the area she was assaulted to Nespelem was corroborated by Frank Clark, who called

Tribal Police on June 20, 2020 and reported the rape. Clark called Tribal dispatch and reported that Victim 3 arrived at his home with torn clothing and no shoes at about 6:00 a.m. that morning. Clark explained that Victim 3 was choked and raped by DOGSKIN near Stepstone Road, close to Gold Lake. He added that Victim 3 got away and walked nearly 20 miles back to town. Clark also volunteered to law enforcement that another victim – Victim 1 – had come to his house just "the other day" and told Clark that DOGSKIN had raped her as well.

**45.** The SANE kit was submitted to the Washington State Patrol Crime Lab for testing. The results showed that the DNA obtained from Victim 3's vaginal swabs contained a mixture consistent with originating from Victim 3 and DOGSKIN. Assuming two contributors and Victim 3 as one of those contributors, the lab report determined it is 1.8 octillion times more likely to observe this DNA profile if it originated from Victim 3 and DOGSKIN rather than if it originated from Victim 3 and one unrelated individual selected at random from the U.S. population. The SANE report further noted contusions and abrasions to Victim 3's genitals, and documented Victim 3's account of being raped.

### July 13, 2022 FBI Interview with DOGSKIN

**46.** On July 13, 2022, Task Force Officer David LaBounty and I interviewed DOGSKIN at the Colville Tribal Correctional Facility in Nespelem, Washington. DOGSKIN had been arrested on tribal charges unrelated to this investigation. After being advised of his Miranda Rights, DOGSKIN agreed to speak with the interviewing agents. During the interview, DOGSKIN stated that he engaged in sexual intercourse with each of the victims referenced herein. According to him, intercourse with each of these women was consensual. DOGSKIN also claimed that he never raped anyone. With respect to the three victims, DOGSKIN provided the following information:

- DOGSKIN described an on-again/off-again relationship with Victim 1. He stated that Victim 1 had accused him of raping her years earlier. DOGSKIN denied raping Victim 1, but acknowledged there had been certain domestic violence incidents during their relationship. DOGSKIN described "DV" as "arguing around" and later acknowledged he may have been physical with people sometimes as well.

- With respect to Victim 2, DOGSKIN claimed he had a 2-3 week relationship with her in 2019 or 2020. He explained that he had sex with Victim 2 several times at his mother's home and at a friend's house. DOGSKIN admitted to hitting Victim 2 and stated there were incidents during their brief relationship involving domestic violence. DOGSKIN also explained that Victim 2 never went anywhere when they were together because she was white, and people wanted to beat her up.

- DOGSKIN described an occasion when Victim 3 was at his mother's house, and she was drunk. According to DOGSKIN, he drove Victim 3 to "Squirrel Trails" in the direction of "Step Stone." DOGSKIN said he drove a blue four-door Buick Century that belonged to his mom. DOGSKIN claimed that during the ride, Victim 3 stated, "I want to fuck," and DOGSKIN responded, "me too." According to DOGSKIN, he and VICTIM 3 stopped, got into the back seat and started having sex. DOGSKIN acknowledged that during the incident, Victim 3 started crying.

- At some point, DOGSKIN got out of the car to use the bathroom. In doing so, he opened the trunk and accidently locked his keys inside. DOGSKIN added he tried to give Victim 3 a ride home and that at some point, both fell asleep in the car – DOGSKIN on the driver's side and Victim 3 on the passenger side. When DOGSKIN awoke the next day around noon, Victim 3 was gone, along with DOGSKIN's coat and cigarettes. DOGSKIN was aware that Victim 3 had alleged DOGSKIN raped her. According to DOGSKIN, Victim 3 never said, "No." DOGSKIN also acknowledged that this is the only time he and Victim 3 had sex.

- DOGSKIN later found out that Victim 1 and Victim 3 were related. DOGSKIN felt that Victim 1 influenced Victim 3 to accuse him (DOGSKIN) of rape.

### August 16, 2022 Tampering with Victim 2

47. On August 23, 2022, Special Agent McIntosh received a call from the Victim Witness Advocate from the Colville Tribe reporting DOGSKIN had contacted Victim 2 and threatened her. SA McIntosh followed up with Victim 2, who reported that on or about August 16, 2022, Victim 2's boyfriend received a telephone call from an unknown male. After the unknown male confirmed the boyfriend's identity, DOGSKIN got on the phone. Victim 2 was within earshot of the phone and recognized DOGSKIN's voice. Victim 2 also overheard the conversation between DOGSKIN and Victim 2's boyfriend. DOGSKIN asked whether the boyfriend was aware that Victim 2 had been speaking with law enforcement. DOGSKIN then stated he was looking for Victim 2, and he was going to make Victim 2 disappear. DOGSKIN further stated that he knew Victim 2 was staying out of town. Victim 2's boyfriend disposed of the phone he was using and got a new phone.

48. Victim 2 did not know how DOGSKIN knew this information and reported to the FBI that she was afraid of DOGSKIN. As a result of the threat on Victim 2's life, the FBI provided Victim 2 with temporary emergency housing.

### CONCLUSION

49. Based upon the information above and my knowledge and experience, there is probable cause to believe ALBERT TRAMPIS DOGSKIN, JR. violated 18 U.S.C. §§ 2241(a), 1153 (Aggravated Sexual Abuse in Indian Country) and 18 U.S.C. § 1512(C) (Tampering with a Witness, Victim, or an Informant). As noted herein, DOGSKIN is an enrolled member of the Standing Rock Sioux Tribe of

North/South Dakota and the underlying aggravated sexual abuse directed at Victim 2 occurred on the Colville Indian Reservation.

_____
Brian R. Hoff, Special Agent
Federal Bureau of Investigation

Sworn to telephonically and signed electronically
~~Sworn to in my presence and signed electronically~~ on this 30th day of August, 2022.

_____
James A. Goeke
United States Magistrate Judge